**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE**


PC Connection, Inc.

     v.                             Civil No. 10-cv-348-LM
                                       Opinion No. 2010 DNH 206 P

Dayton Crabtree


# O R D E R


In this civil action, plaintiff, PC Connection, Inc.
(hereinafter "plaintiff" or "PC Connection"), sues the
defendant, Dayton Crabtree (hereinafter "defendant" or
"Crabtree"), alleging cyberpiracy, trademark infringement,
violations of state consumer protection law, and other federal
claims under the Lanham Act, 15 U.S.C. § 1051, et seq.  Doc. No.
6.  PC Connection is an online retailer that markets and sells
computer products, electronics, and related goods and services
on both a national and international scale.  Crabtree owns a
computer information technology company called Computer
Connections, of which he is the sole employee, that operates out
of Hedgesville, West Virginia.

On August 17, 2010, plaintiff filed a motion seeking a
temporary restraining order ("TRO") and preliminary injunction.
Doc. No. 7.  In an order issued August 20, 2010, the Court
granted the TRO and ordered Crabtree to, among other things,

disable the link to his website and stop using "in any way" a
domain name "confusingly similar" to plaintiff's registered
domain name.  Doc. No. 8.  On September 2, 2010, Crabtree filed
a pleading in which he contested the court's personal
jurisdiction over him.  Doc. No. 11.  The court scheduled a
hearing on the plaintiff's motion for preliminary injunction and
allowed the parties, in advance of the hearing, to further brief
the issue of personal jurisdiction.  Doc. No. 13.  On October 5,
2010, this Court held a hearing on plaintiff's request for a
preliminary injunction.  For the reasons set forth herein, I
decline to exercise personal jurisdiction over this defendant,
and transfer the case to the United States District Court for
the Northern District of West Virginia.

**BACKGROUND**

This case concerns a dispute about Crabtree's use of the
domain name "pc-connections.com" for his website, a name very
similar to plaintiff's registered trademarks and tradename, as
well as its registered internet domain name.  Plaintiff is a
Delaware corporation with a principal place of business in
Merrimack, New Hampshire.  For more than twenty years,
plaintiff, a computer services company operating on a global
scale, has owned the federal registration for the trademark "PC
Connection" and has used the trademark and tradename in its

business.  Plaintiff is also the registered owner of the internet domain name "pcconnection.com."

Crabtree recently started a small business, Computer Connections, to provide computer related services to individuals within a twenty-five mile radius of his home in Hedgesville, West Virginia.  To further his business, he went to GoDaddy.com, a well-known purveyor of internet domain names, and entered the name of his business.  The website generated a list of available domain names relating to the business name Crabtree entered. After considering a few alternatives, Crabtree purchased "pc-connections.com" and set up a website using that domain name. Crabtree's website was informational and advertised his services.  The only interactivity the website allowed was the ability to contact Crabtree by email by clicking on a link on the website's homepage.  In addition to the domain name, Crabtree used "@pc-connections.com" as his business email extension.

Pamela Carter works in plaintiff's legal department.  One of her responsibilities includes the monitoring and management of plaintiff's intellectual property.  She is responsible for preventing the infringement and dilution of plaintiff's trademarks and domain names.  According to the testimony she gave at the hearing, on April 26, 2010, Carter received a report

from Checkmark Network, a company plaintiff employs to monitor and capture internet occurrences of words similar to plaintiff's trademarks. That report indicated that, on April 7, 2010, Crabtree registered the domain name "pc-connections.com."  Ex. 6.

Carter stated that she accessed the homepage for Crabtree's domain name and found defendant's website for "Computer Connections."  Ex. 7.  The subtitle, "Information Technology services with integrity, excellence & teamwork," sat atop the following four separate links: "Services," "Solutions," "Support," and "About."  Id.  Visible on the upper right corner of the homepage was the phrase "Serving Hagerstown[,] Martinsburg and the surrounding areas."  At the bottom of the homepage was a West Virginia telephone number and an active link to an email address.  Id.  Carter testified that the products and services offered by Computer Connections appeared "very similar if not identical" to those offered by plaintiff.

Between the dates of April 27, 2010, the day after plaintiff discovered Crabtree's website, and August 10, 2010, when plaintiff filed the instant lawsuit, the parties engaged in a series of communications via letter and email.  As plaintiff asserts that these communications provide evidence to support

this court's personal jurisdiction over Crabtree, they are summarized below.

On April 27, 2010, shortly after Carter discovered Crabtree's website, PC Connection, through its attorney, Peter Lando, sent Crabtree a "cease and desist" letter.  That letter explained that plaintiff was a New Hampshire corporation that owned federal trademarks and registrations for the mark "PC Connection" to use in connection with its computer sales business.  Ex. 8.  The letter also explained that plaintiff owned the registration for the domain name and mark "pcconnection.com" for "retail store services, offered via a global computer network and web site featuring computers, computer systems, peripherals and software."  Id.  Lando outlined the history of plaintiff's ownership of the "pcconnections.com" domain name and its many years of marketing through its website under that brand name.  Lando ended his letter with the following demand that Crabtree discontinue his use of the domain name "pc-connections.com":

> Because you are using the domain name *<pc-connections.com>* in connection with computer-related information technology services, our client has no choice but to take appropriate action to halt your activities.  Customers or potential customers who see such services offered at the domain *<pc-connections.com>* are bound to believe that your services emanate from, or are licensed, endorsed, or sponsored by, our client.  Any dissatisfaction with your services will reflect upon and irreparably

damage our client's hard-earned reputation and
goodwill, as embodied in its PC CONNECTION marks.

Therefore we strongly urge you to abandon all
plans and activities involving use of the domain name
*pc-connections.com*.  Our client is willing to
reimburse you for the domain name registration fee,
provided that you agree to transfer ownership of the
domain name to PC Connection, Inc.

Our client believes that an amicable resolution
of this matter, without further legal complications,
is the best outcome for both parties.

We look forward to your response.

Id.

After receiving the April 27 letter, Crabtree, who

testified that he was unaware of PC Connection at the time,

investigated PC Connection and learned that it was a large,

publicly traded company in the business of online computer sales

and services.  On April 29, 2010, Crabtree responded to Lando in

an email:

I can appreciate your client, PC Connection,
Inc.'s concern; however, the timing may be detrimental
to my business and livelihood.  I do not enter into
decisions lightly, research and a survey was completed
in the selection of the domain name,
pc-connections.com.  At no time did PC Connection,
Inc. factor into this decision, as pc-conenctions.com
[] was readily available for purchase and the most
closely aligned available domain name to the business
name, Computer Connections.  Other than a registration
fee, I have invested time and money into the URL,
pc-connections.com, and email addresses at
pc-connections.com, for example: brochures, business
cards, search engine submissions, business
directories, networking events, distribution list
mailings and emails, various other marketing methods,

and secure Internet services via pc-connections.com.
Please contact me as soon as possible to attempt an
amicable resolution of this matter.

Ex. 9.

Two months passed with no correspondence between the
parties.  Then, in a letter to Crabtree dated June 30, 2010,
Lando again offered to settle the dispute by paying Crabtree the
cost of his domain registration fee for his transferring
ownership of the domain name to plaintiff.  Ex. 10.  Lando
wrote: "This is the final offer to settle this matter before we
seek to enforce our client's rights and pursue all available
remedies."  Id.

On August 10, 2010, plaintiff filed a five-count complaint
against Crabtree seeking, among other things, injunctive relief
and damages for Crabtree's alleged trademark infringement and
dilution, cyberpiracy, unfair competition and unfair and
deceptive trade practices.  Doc. No. 1.  On that same date,
Steven Grill, litigation counsel for plaintiff, forwarded to
Crabtree, via email, a copy of the complaint, with a final offer
to settle the case.  Plaintiff's final offer was that, at no
cost to plaintiff, Crabtree would transfer ownership of the
domain name to plaintiff and agree to stop using that name or
any other name "confusingly similar" to plaintiff's tradename.
Doc. No. 12-3.  Thereafter, on that date, Grill and Crabtree

exchanged a series of emails (doc. no. 12-3), the relevant

portions of which are set forth below:

<u>Crabtree</u>:

. . . I am not in competition with PC Connection,
but am a local business in Hedgesville, West Virginia.
I am not internet-based, have not done anywhere near
$75,000 in business since being laid off from my full-
time job last year, I have not resold any hardware or
software, but am designated as an electronic data
services provider.  pc-connections.com was recommended
to me through a Godaddy.com search according to my
business name and there never was nor ever will be any
intent to infringe upon PC Connection. I am a single
father and Computer Connections is the livelihood of
my family.  What I have invested into my business has
mainly been marketing using the url and email
addresses associated with pc-connections.com; if I can
procure a relevant [dot]com domain name and am
compensated for previous marketing expenses, domain
name costs, and equal future marketing of a different
domain name, I am willing to work with PC Connection.

<u>Grill</u>:

Thank you for your prompt reply . . . I am sure
there are other names out there that would suit your
business purposes without creating a serious potential
for confusing customers.  I certainly encourage you to
select such a name immediately, to stop doing business
as "PC-Connections," and to notify the hosting company
and/or registrar immediately that you intend to
transfer the pc-connections.com domain to PC
Connection.

You are not entitled to any compensation from PC
Connection and I note that PC Connection's voluntary
offer to reimburse you for the domain name
registration fee [has] expired . . . . I will check
with my client to see if that reimbursement offer can
be put back on the table, but my previous message
still stands: you must confirm by the close of
business Friday that the pc-connections name will be
transferred to PC Connection, and you must agree not

to use any confusingly similar names in the future.

I look forward to your agreement on these points so that it will not be necessary to proceed with the litigation.

Crabtree:

I do not agree, as I am not cybersquatting or doing business as PC-Connections, and the effects would be detrimental to my livelihood; however, I will be adding a "not affiliated with PC Connection, Inc." to my website.

Grill:

Unfortunately that approach will not be adequate, as consumers and potential consumers who surf the Web could still be misdirected to your website and PC Connection cannot allow this type of confusion to exist.  If that is your final position then you leave me no choice but to proceed with litigation.

Crabtree:

That's about all I can do at this point.  I'm trying to keep up with the mortgage and put food on the table.  If this large corporation wants to proceed with pursuing detrimental effects to my family's livelihood, then so be it . . . I've always been fond of David's willingness to stand up to Goliath for what is right.  Most [dot]com addresses have been monopolized by corporations such as PC Connection, so there are not a lot of options available.  Whether users are misdirected to my site or not, I am clearly not affiliated or in competition with PC Connection . . . .

Doc. No. 12-3.

The following additional facts are uncontested and are relevant to my consideration of the issues presented here:

- Between April 7, 2010, and the date Crabtree disabled his website (on or about August 28, 2010), Ex. 11, Crabtree's website generated less than $3,000.00 in revenue for his business.

- Computer Connections is operated by a single employee, Crabtree, in Hedgesville, West Virginia.  Crabtree's website offers local, on-site computer services within a twenty-five mile radius of Crabtree's residence.  Doc. No. 11.  Crabtree testified that the website was primarily informational, in that it provided information about his business to potential customers, and provided an avenue for a visitor to the website to make contact with him by email via a direct link located on the website's homepage.  Ex. 7.

- A consumer who located Crabtree's website online could not order products through the website.  The only active aspect of the website was the email link, through which Crabtree could make contact with customers in order to conduct business.  Ex. 7.  Although Crabtree has made sales through the use of his website, he testified that he did "not do many sales on the internet."

- The only contact outside of Crabtree's local area that his website has generated is the contact with plaintiff related to this lawsuit.  Doc. No. 14.

• As recently as September 15, 2010, in email communications to Grill, Crabtree was still using an email signature that contained the domain name, "pc-connections.com," and email address "dayton@pcconnections.com"  Ex. 13.  Crabtree testified, and no contrary evidence was offered, that he was only using the email address in his communications with Grill and certain existing customers, but that the website remained disabled.

**DISCUSSION**

I.   <u>Standard of Review</u>

"To hear a case, a court must have personal jurisdiction over the parties, that is, the power to require the parties to obey its decrees."  <u>Astro-Med, Inc. v. Nihon Kohden Am., Inc.</u>, 591 F.3d 1, 8 (1st Cir. 2009) (internal citation and quotations omitted).  When personal jurisdiction is contested, the burden lies on plaintiff to establish that the Court has such jurisdiction.  <u>See</u> <u>Hannon v. Beard</u>, 524 F.3d 275, 279 (1st Cir.), <u>cert. denied</u>, ___ U.S. ___, 129 S. Ct. 726 (2008); <u>GT Solar Inc. v. Goi</u>, Civ. No. 08-cv-249-JL, 2009 WL 3417587, at *2 (D.N.H. 2009); <u>ICP Solar Techs., Inc. v. TAB Consulting, Inc.</u>, 413 F. Supp. 2d 12, 14 (D.N.H. 2006).  Allegations of jurisdictional facts are construed in the plaintiff's favor. <u>ICP Solar</u>, 413 F. Supp. 2d at 14.

In this case, I apply the "most conventional" standard, the prima facie standard.  See Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d 42, 51 (1st Cir. 2002). Under the prima facie standard, courts "take specific facts affirmatively alleged by the plaintiff as true (whether or not disputed) and construe them in the light most congenial to the plaintiff's jurisdictional claim."  Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n, 142 F.3d 26, 34 (1st Cir. 1998).

> To make a prima facie showing of this calibre, the plaintiff ordinarily cannot rest upon the pleadings, but is obliged to adduce evidence of specific facts . . . .  [T]he district court acts not as a factfinder, but as a data collector.  That is to say, the court, in a manner reminiscent of its role when a motion for summary judgment is on the table, . . . must accept the plaintiff's (properly Documented) evidentiary proffers as true for the purpose of determining the adequacy of the prima facie jurisdictional showing.

Foster-Miller, Inc. v. Babcock & Wilcox Can., 46 F.3d 138, 145 (1st Cir. 1995).  Plaintiff is obliged to rely on specific facts set forth in the record to defeat defendant's motion to dismiss based on an alleged lack of personal jurisdiction.  See ICP Solar, 413 F. Supp. 2d at 14.  The Court may also consider uncontested facts submitted by the defendant.  See Mass. Sch. of Law., 142 F.3d at 34.  The court does not assess credibility or engage in other "differential factfinding."  Foster-Miller, 46 F.3d at 145.  "Despite the liberality of this approach, the law

does not require [the court] . . . to credit conclusory allegations or draw farfetched inferences." <u>Mass. Sch. of Law</u>, 142 F.3d at 34 (internal quotations omitted).

## II.  <u>Personal Jurisdiction</u>

### A.  <u>Source of Law</u>

To make a determination as to whether or not an out-of-state defendant should be subjected to this Court's jurisdiction, the Court must examine "whether contacts between the defendant and the forum are sufficient to satisfy the state's long arm statute and comport with the Fourteenth Amendment's Due Process clause." <u>GT Solar</u>, 2009 WL 3417587, at *6 (citing <u>Sawtelle v. Farrell</u>, 70 F.3d 1381, 1387 (1st Cir. 1995)).  New Hampshire's long arm statute is coextensive with federal constitutional limits on jurisdiction.  <u>See Phillips Exeter Acad. v. Howard Phillips Fund, Inc.</u>, 196 F.3d 284, 287 (1st Cir. 1999).  Accordingly, the personal jurisdictional inquiry becomes the single question of whether the constitutional requirements of due process have been met.  <u>See GT Solar</u>, 2009 WL 3417587, at *6.

### B.  <u>Test</u>

The determination as to whether a forum court has jurisdiction over an out-of-state defendant is grounded in "traditional notions of 'fair play and substantial justice'

13

inherent in the due process clause." GT Solar, 2009 WL 3417587,
at *6 (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 464
(1985) (internal quotations and citations omitted)).
Jurisdiction may therefore only be asserted over an out-of-state
defendant where "the defendant's conduct and connection with the
forum State are such that he should reasonably anticipate being
haled into court there."  World-Wide Volkswagen Corp. v.
Woodson, 444 U.S. 286, 297 (1980).

     The "constitutional touchstone" for personal jurisdiction
is "whether the defendant purposefully established minimum
contacts in the forum State."  Burger King, 471 U.S. at 474
(internal quotations omitted).  The Court must make a fact-
specific inquiry into the "minimum contacts" present in a
particular case, "involving an individualized assessment and
factual analysis of the precise mix of contacts" in that case.
Pritzker v. Yari, 42 F.3d 53, 60 (1st Cir. 1994).  A court does
not properly assert jurisdiction over an out-of-state defendant
if that defendant's contacts with the forum state are merely
"random," "fortuitous," or "attenuated."  Burger King, 471 U.S.
at 475.

     "Jurisdiction cannot be created by the unilateral activity
of a plaintiff; rather 'it is essential in each case that there
be some act by which the defendant purposefully avails itself of

14

the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" GT Solar, 2009 WL 3417587, at *7 (quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958)).  In addition to minimum contacts with the forum state, the exercise of jurisdiction over the defendant must be reasonable, and the plaintiff's claims must "be related to the defendant's contacts." Cambridge Literary Props. v. W. Goebel Porzellanfabrik G.m.b.H., 295 F.3d 59, 63 (1st Cir. 2002) (internal citation omitted).

There are two forms of personal jurisdiction: general jurisdiction, where a defendant maintains "continuous and systematic" contacts with the forum state, and specific jurisdiction, where, in the absence of "continuous and systematic" contacts, "the plaintiff's cause of action relates sufficiently to, or arises from, a significant subset of contacts between the defendant and the forum." GT Solar, 2009 WL 3417587, at *7 (internal quotations and citation omitted); see Mass. Sch. of Law., 142 F.3d at 34 (to show specific jurisdiction there must be "a demonstrable nexus between a plaintiff's claims and a defendant's forum-based activities"); United Elec. Workers, 960 F.2d at 1088-89.  Here, plaintiff does not claim that this Court can exercise general jurisdiction over defendant.  Accordingly, this analysis is limited to whether or

not the Court may properly exercise specific personal

jurisdiction over the defendant in this case.

The First Circuit has established a three-part test to

determine whether a district court might properly exercise

specific jurisdiction in a particular case.  See Negron-Torres

v. Verizon Commc'ns, Inc., 478 F.3d 19, 24 (1st Cir. 2007);

Mass. Sch. of Law, 142 F.3d at 35.

> The plaintiff must demonstrate that: (1) the cause of
> action directly relates to or arises from the
> defendant's in-state activities ("relatedness"), (2)
> the defendant purposefully availed itself of the
> benefits and protections of New Hampshire's laws such
> that its presence in a New Hampshire court was
> voluntary and foreseeable ("purposeful availment"),
> and (3) that the exercise of personal jurisdiction is
> reasonable ("reasonableness").[1]

GT Solar, 2009 WL 3417587, at *7 (citing Negron-Torres, 478 F.3d

at 24, and Phillips Exeter Acad., 196 F.3d at 288)  The Court

must find that each of these three factors is present to support

a finding of specific personal jurisdiction.  See United States

v. Swiss Am. Bank, Ltd., 274 F.3d 610, 625 (1st Cir. 2001);

Phillips Exeter Acad., 196 F.3d at 288.  Further, specific

jurisdiction is claim-specific, which means a plaintiff "must

demonstrate that all three elements of specific jurisdiction are

satisfied with respect to each claim asserted."  GT Solar, 2009

WL 3417587, at *7 (internal citation omitted).

---

[1] I will refer to this test as the "Negron-Torres test" and to the
three prongs of the test as the "Negron-Torres factors."

16

C.  The Negron-Torres Factors

1.  Relatedness

The relatedness requirement "focuses on the nexus between [the] defendant's contacts and the plaintiff's cause of action." GT Solar, 2009 WL 3417587, at *7 (quoting Swiss Am. Bank, 274 F.3d at 621).  To satisfy the relatedness prong of the three-part test, "the defendant's in-state conduct must form an important or [at least] material element of proof in the plaintiff's case." GT Solar, 2009 WL 3417587, at *8 (quoting Harlow v. Children's Hosp., 432 F.3d 50, 61 (1st Cir. 2005) (internal quotations and citations omitted)).  "The court must determine the 'focal point' of the plaintiff's claim, and 'assess the interactions between the defendant and the forum state through that prism.'" GT Solar, 2009 WL 3417587, at *8 (quoting Phillips Exeter Acad., 196 F.3d at 290).  Of course, before the Court can conduct a "relatedness" inquiry, it must identify the alleged contacts; if no contacts exist, the court cannot find that the requisite nexus between those contacts and plaintiff's cause of action exists.  See GT Solar, 2009 WL 3417587, at *8.  Once contacts are identified, the court must then "look for a 'meaningful link' between the contact and the harm" alleged. GT Solar, 2009 WL 3417587, at *7 (quoting Nowak

v. Tak How Invs., Ltd., 94 F.3d 708, 716 (1st Cir. 1996); see
ICP Solar, 413 F. Supp. 2d at 19.

After consideration of the record presently before the
Court, including the pleadings, testimony, and exhibits
submitted, I identify the following as the relevant contacts
between defendant and this forum for purposes of this personal
jurisdiction analysis:

1.   The defendant utilized the domain name "pc-
connections.com" as a website for his computer business between
mid-April 2010 and approximately August 28, 2010.

2.   The defendant utilized the email extension "@pc-
connections.com" from mid-April 2010, until September 2010.

3.   The defendant responded, by email, to a number of
emails and letters from PC Connections, a company located in New
Hampshire, between April 29, 2010, and August 10, 2010.

In order to satisfy the "relatedness" requirement for a
finding of personal jurisdiction, plaintiff must demonstrate
that these contacts are "an important or at least material
element of proof in the plaintiff's case."  Harlow, 432 F.3d at
61.  Plaintiff has alleged trademark infringement and
cybersquatting.  The use of an allegedly infringing domain name
is a material element of trademark infringement.  See Venture
Tape Corp. v. McGills Glass Warehouse, 540 F.3d 56, 60 (1st Cir.

2008), <u>cert. denied</u>, ___ U.S. ___, 129 S. Ct. 1622 (2009)
(setting out elements of trademark infringement claim).
Accordingly, I find that the use of "pc-connections.com" and
"@pc-connections.com" are sufficiently related to the claim of
trademark infringement for purposes of the first <u>Negron-Torres</u>
factor.

As to the emails sent by defendant in response to letters
and emails sent to him by plaintiff, I find that no such
"relatedness" has been demonstrated.  Plaintiff has asserted
that the emails constitute "extortion" and that the "demand[s]
for money" contained within the emails manifest a material
element of cyberpiracy or cybersquatting, pursuant to the Anti-
Cybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. §
1125(d).

The ACPA was passed "primarily in an effort to stop
cybersquatters who register numerous domain names containing
American trademarks or tradenames only to hold them ransom in
exchange for money."  <u>Bay State Sav. Bank v. Baystate Fin.</u>
<u>Servs., LLC</u>, 484 F. Supp. 2d 205, (D. Mass. 2007) (internal
quotations and citations omitted).  To state a violation of the
ACPA, plaintiff must demonstrate that "(1) it has a valid
trademark entitled to protection; (2) its mark is distinctive or
famous; (3) the defendant's domain name is identical or

confusingly similar to, or in the famous marks, dilutive of, the

owner's mark; and (4) the defendant used, registered, or

trafficked in the domain name (5) with a bad faith intent to

profit." Nationwide Payment Solutions, LLC v. Plunkett, 697 F.

Supp. 2d 165, 172 (D. Me. 2010).

    The record before the Court easily establishes the first

four elements.  The fifth element, possession by defendant of

"bad faith intent," however, is where the plaintiff's

allegations falter.  The ACPA sets out nine non-exhaustive

factors to evaluate in determining the existence of bad faith:

> (I) the trademark or other intellectual property
> rights of the person, if any, in the domain name;
> (II) the extent to which the domain name consists
> of the legal name of the person or a name that is
> otherwise commonly used to identify that person;
> (III) the person's prior use, if any, of the
> domain name in connection with the bona fide
> offering of any goods or services; (IV) the
> person's bona fide noncommercial or fair use of
> the mark in a site accessible under the domain
> name; (V) the person's intent to divert consumers
> from the mark owner's online location to a site
> accessible under the domain name that could harm
> the goodwill represented by the mark, either for
> commercial gain or with the intent to tarnish or
> disparage the mark, by creating a likelihood of
> confusion as to the source, sponsorship,
> affiliation, or endorsement of the site; (VI) the
> person's offer to transfer, sell, or otherwise
> assign the domain name to the mark owner or any
> third party for financial gain without having
> used, or having an intent to use, the domain name
> in the bona fide offering of any goods or
> services, or the person's prior conduct
> indicating a pattern of such conduct; (VII) the
> person's provision of material and misleading

20

> false contact information when applying for the
> registration of the domain name, the person's
> intentional failure to maintain accurate contact
> information, or the person's prior conduct
> indicating a pattern of such conduct; (VIII) the
> person's registration or acquisition of multiple
> domain names which the person knows are identical
> or confusingly similar to marks of others that
> are distinctive at the time of registration of
> such domain names, or dilutive of famous marks of
> others that are famous at the time of
> registration of such domain names, without regard
> to the goods or services of the parties; and (IX)
> the extent to which the mark incorporated in the
> person's domain name registration is or is not
> distinctive and famous within the meaning of
> subsection (c) of this section.

15 U.S.C. § 1125(d)(1)(B)(i)(I)-(IX).  The statute continues:

"Bad faith intent . . . shall not be found in any case in which

the court determines that the person believed and had reasonable

grounds to believe that the use of the domain name was a fair

use or otherwise lawful."  15 U.S.C. § 1125(d)(1)(B)(ii).

Upon consideration of these factors, I find that the

undisputed facts on this limited record do not support a finding

that the defendant here has likely violated the ACPA, as those

facts do not make out "bad faith intent" on the part of the

defendant.  Here, although the domain name "pc-connections.com"

is arguably confusingly similar to plaintiff's registered marks,

defendant legally purchased the domain name through Godaddy.com

in order to use it for his own small business.  Defendant then

actually used the domain name for his own bona fide business

purposes and transactions.  Nothing in the record indicates that
defendant sought to capitalize on the goodwill of plaintiff or
to confuse consumers or divert consumers to his own website.  To
the contrary, the undisputed evidence in the record is that
prior to receiving the "cease and desist" letter, defendant was
unaware the plaintiff existed.  Further, when he was alerted to
the similarity between his domain name and plaintiff's mark,
defendant offered to place a non-affiliation statement on his
website without charge.

     Defendant purchased only one domain name.  Defendant did
not initiate any exchange with the plaintiff in an effort to
sell the domain name for profit.  No evidence or allegation
before the Court suggests that defendant has ever engaged in any
pattern or past instance of purchasing and selling domain names
for profit, or has ever purchased a domain name that he did not
actually use.  Further, the contact information on defendant's
website was for himself and for "Computer Connections," not PC
Connection.  Any offer the defendant did make to sell the domain
name to PC Connection occurred after defendant was using the
domain name in the bona fide offering of goods and services, and
after PC Connection initiated the conversation about money when
it offered to pay Crabtree for the domain name registration fee
and invited Crabtree to respond.  Defendant's response to that

offer was not an extortionate demand, but was a legitimate and
reasoned response explaining why he was unable to accept the
plaintiff's offer.

Even construing the facts in plaintiff's favor, there is no
evidence before the Court that plaintiff acted with bad faith
intent.  When defendant declined to promptly discontinue all use
of "pc-connections.com" for several days after the Court ordered
him to do so, and failed to discontinue use of the "@pc-
connections.com" extension for an additional period of time,
those events occurred after the conclusion of the email
correspondence.  Nothing on the record suggests that there were
any further negotiations between the parties, and in particular,
none initiated by Crabtree, after August 2010.[2]  Accordingly, the
defendant's continued use of the marks does not, on this record,
appear to have anything to do with plaintiff's allegation of
cybersquatting.

Moreover, contrary to plaintiff's argument, the limited
record before the Court illustrates only that defendant wanted
sufficient money from plaintiff to cover his expenses.
Plaintiff points to defendant's request for both reimbursement
for past expenses and the cost of future marketing as evidence

_____

[2]Defendant's September 15, 2010, email to Grill was a one-line
request for Grill to email Crabtree a copy of Grill's most
recent filing in the case.  Ex. 13.

that he was attempting to "extort" more money than he had
invested in the domain name.  The request from defendant,
however, is more accurately interpreted as a request to cover
the cost to him, of both time and money, in making the switch to
a new domain name which might well cost more than what had been
invested in marketing with the "pc-connections.com" information.
For instance, in addition to replacing stationery and business
cards, and in addition to the cost of the new domain
registration name, all of which could be covered by
reimbursement for previous costs, the switch in domain names
could require additional marketing, such as mailings to notify
customers and potential customers of the change in information.
Even if Crabtree were requesting money in excess of his
expenses, such a request was made in the context and course of
negotiations initiated by the plaintiff.  The request made does
not, on its face, appear to be an unreasonable negotiation
position.

       I find that, on the present record, plaintiff has not made
out a prima facie case that defendant's request for
reimbursement of marketing expenses in exchange for the
relinquishment of defendant's legally obtained domain name
constituted any element of cybersquatting.  Accordingly, the

email correspondence does not establish relatedness for the purposes of the <u>Negron-Torres</u> test.

2.    Purposeful Availment

The "purposeful availment" prong requires the Court to inquire into whether the defendant's contacts with the forum state constitute an intentional availment of the "privilege of conducting activities in the forum state," <u>GT Solar</u>, 2009 WL 3417587, at *8 (quoting <u>Sawtelle</u>, 70 F.3d at 1389), "thereby invoking the benefits and protections" of our laws. <u>ICP Solar</u>, 413 F. Supp. 2d at 19.  To be considered "purposeful availment," contact with the forum state must be voluntary and must create a foreseeable possibility that the defendant could be called to answer in a court of the forum state.

> Voluntariness requires that the defendant's contacts
> with the forum state proximately result from actions
> by the defendant *himself*.  The contacts must be
> deliberate, and not based on the unilateral actions
> of another party.  Foreseeability requires that the
> contacts also must be of a nature that the defendant
> could reasonably anticipate being haled into court
> there.

<u>Phillips v. Prairie Eye Ctr.</u>, 530 F.3d 22, 28 (1st Cir. 2008), <u>cert. denied</u>, ___ U.S. ___, 129 S. Ct. 999 (2009) (emphasis in original) (quotations and citations omitted).  The purposeful availment prong is therefore satisfied only if the plaintiff can demonstrate that a "defendant purposefully and voluntarily

directs his activities toward the forum so that he should expect, by virtue of the benefit he receives, to be subject to the court's jurisdiction based on these contacts." <u>GT Solar</u>, 2009 WL 3417587, at *8 (internal quotation and citations omitted).  The purposeful availment requirement "ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or a third person." <u>Burger King</u>, 471 U.S. at 475 (internal citations and quotations omitted).

a.   <u>The Domain Name and Email Extension</u>

Where purposeful availment is alleged to have taken place only by virtue of an internet presence accessible in the forum state, "[t]he likelihood that personal jurisdiction can be constitutionally exercised is directly proportionate to the nature and quality of commercial activity than an entity conducts over the Internet." <u>Zippo Mfg. Co. v. Zippo Dot Com, Inc.</u>, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997) (addressing whether website activity supported claim of specific jurisdiction).  The oft-cited <u>Zippo Mfg.</u> opinion articulates a "sliding scale" to evaluate the extent of a website's contacts with a forum state:

> At one end of the spectrum are situations where a
> defendant clearly does business over the Internet.
> If the defendant enters into contracts with
> residents of a foreign jurisdiction that involve the
> knowing and repeated transmission of computer files
> over the Internet, personal jurisdiction is proper.
> At the opposite end are situations where a defendant
> has simply posted information on an Internet Web
> site which is accessible to users in foreign
> jurisdictions.  A passive Web site that does little
> more than make information available to those who
> are interested in it is not grounds for the exercise
> [of] personal jurisdiction.  The middle ground is
> occupied by interactive Web sites where a user can
> exchange information with the host computer. In
> these cases, the exercise of jurisdiction is
> determined by examining the level of interactivity
> and commercial nature of the exchange of information
> that occurs on the Web site.

Zippo Mfg., 952 F. Supp. at 1124 (internal citations omitted).

"[T]he mere existence of a website that is visible in a forum

and that gives information about a company and its products is

not enough, by itself, to subject a defendant to personal

jurisdiction in that forum." Cossaboon v. Me. Med. Ctr., 600

F.3d 25, 35 (1st Cir. 2010) (internal quotation and citation

omitted).

If a mere presence on the internet were enough to give rise

to personal jurisdiction anywhere the website could be viewed,

there would essentially be no limit on personal jurisdiction

over out-of-state defendants.  See id.  For website activity to

give rise to an exercise of personal jurisdiction over the

operator of the website, something more than mere presence is

necessary, "such as interactive features which allow the
successful online ordering of the defendant's products."  See
id. (internal quotation and citation omitted).  The
availability, in a forum, of some interactive features that do
not specifically target business in that forum do not alone
render a website sufficient to create a contact in that forum.
See id. (mere fact of hospital website's accessibility in New
Hampshire, where website was not purely informational, and where
visitors could donate money, pre-register patients, register for
classes, find a doctor, or apply for employment, "does not
indicate that [hospital] purposefully availed itself of the
opportunity to do business in New Hampshire").

     There is no question that defendant used the domain name
"pc-connections.com" and the email extension "@pc-
connections.com" for his business.  Further, there is no
question that his website was accessible in New Hampshire.
Under the Zippo Mfg. framework, the question becomes, therefore,
into what category of interactivity the defendant's website
falls.  The evidence before the Court is that defendant's
customers could not purchase products or services directly from
the website, and that, with the exception of the email link, the
website was only informational, not interactive.  Defendant
concedes that he did obtain some business through email

communication that had been initiated by clicking on the email link on the website.

However, to the extent that such minimal interactivity as providing a link to email would qualify as "middle ground" for purposes of the Zippo analysis, the court must inquire "into the level of the interactivity between [defendant] and residents of New Hampshire and an examination of the commercial nature of that interactivity." ICP Solar, 413 F. Supp. 2d at 19. The Fourth Circuit has found that personal jurisdiction over an out-of-state defendant may be exercised, when the jurisdiction is based on an electronic internet presence in the forum state, "when that person (1) directs electronic activity into the State, (2) with the manifested intent of engaging in business or other interactions within the State, and (3) that activity creates, in a person within the State, a potential cause of action cognizable in the State's courts." ALS Scan, Inc. v. Digital Serv. Consultants, Inc., 293 F.3d 707, 714 (4th Cir. 2002). The Sixth Circuit has held that purposeful availment exists where "the [website] is interactive to a degree that reveals specifically intended interaction with the residents of the state." Neogen Corp. v. Neo Gen Screening, Inc., 282 F.3d 883,890 (6th Cir. 2002).

Here, aside from his correspondence with plaintiff, which was not commercial in nature and was not initiated with the purpose of "engaging in business or other interactions within the State," ALS Scan at 714, neither defendant nor his website had any interactions with anyone in the State of New Hampshire. Although defendant's website could be accessed from New Hampshire, "[a] passive website that does little more than make information available to those who are interested in it is not grounds for the exercise of personal jurisdiction." Toytrackerz, LLC v. Koehler, 2009 WL 1505705, *7 (D. Kan. 2009); see Cossaboon, 600 F.3d at 35.  Further, the homepage of Crabtree's website stated explicitly that it was a business serving only a small area of West Virginia.  No advertising or any other commercial activity was ever directed at New Hampshire or any New Hampshire resident.  Defendant took no action to intentionally seek the privileges or benefits of doing business in New Hampshire.  The mere existence of the website and email extension is insufficient to constitute purposeful availment.

This does not end the inquiry.  Plaintiff asserts that when Crabtree received the April 27, 2010, letter from Lando, he became aware of the allegation that he was infringing on the mark of a New Hampshire corporation, and therefore, the continued use of the mark after that date constituted purposeful

30

availment.  I do not find that continuing the use of the domain
name and email extension at that time, however, constitutes
purposeful availment.  To the contrary, the evidence in the case
demonstrates that defendant voluntarily offered to add "not
affiliated with PC Connection" to his website upon learning of
the existence of that company, that his website specifically and
explicitly targeted only a small area in West Virginia, and that
he had never received an inquiry or any business from New
Hampshire, before or after receiving the letter.

The fact that plaintiff alerted defendant to its own
opinion that he was infringing on their marks does not render
defendant's continued use of that mark "purposeful availment."
Here, defendant disagreed with plaintiff's opinion, voluntarily
offered to add "not affiliated with PC Connection" to his
website to avoid any potential confusion, and did nothing
affirmative to exploit any similarity between his domain name
and plaintiff's marks.  Upon these facts, purposeful availment
was not created simply by Crabtree's receipt of a "cease and
desist" letter.  To find otherwise would authorize personal
jurisdiction in this forum over any defendant who receives a New
Hampshire corporation's "cease and desist" letter and does not
immediately discontinue his use of the allegedly infringing
mark.

31

This analysis changes, however, at the point where the Court issued a Temporary Restraining Order enjoining defendant's use of "pc-connections.com" and the related email extension.  At that point, defendant was explicitly made aware of the Court's finding that plaintiff was likely to succeed on its claims that defendant's use of "pc-connections.com" and its email extension constituted infringement on plaintiff's marks.  Defendant, however, did not immediately disable the website, but waited several days to do so.  Additionally, defendant continued to use the "@pc-connections.com" email extension until at least September 2010, in violation of the Court's TRO.

Accordingly, to the extent that defendant maintained his website at "pc-connections.com" after August 20, 2010, or continued to use the "@pc-connections.com" email extension after that date, I find that defendant purposefully availed itself of the benefits of using the infringing mark of a New Hampshire corporation.  Accordingly, as to Crabtree's limited use of "pc-connections.com" in his email signature after August 20, 2010, and his use of "@pc-connections.com" in communications with an existing client after August 20, 2010, plaintiff has established a prima facie case supporting a finding of "purposeful availment" for purposes of the Negron-Torres test.

b.   The Email Correspondence

All of the correspondence between the parties prior to bringing this lawsuit was initiated by plaintiff.  Plaintiff also initiated settlement negotiations by stating first its desire for an "amicable solution" and then by affirmatively offering to pay defendant for relinquishing the domain name in question.  I cannot find that responding to these emails, albeit in a manner not satisfying to plaintiff, and continuing a negotiation initiated by plaintiff, constitute purposeful availment of the privileges of doing business in New Hampshire. See GT Solar, 2009 WL 3417587, at *8.  I find, therefore, that nothing in the fact or content of the email correspondence between Crabtree and plaintiff constitutes purposeful availment.

3.   Reasonableness

The third, and final, prong of the Negron-Torres test "involves the reasonableness and essential fairness of asserting jurisdiction over a foreign defendant." GT Solar, 2009 WL 3417587, at *8.  Reasonableness is evaluated by considering the following five "gestalt factors":

> (1) the defendant's burden of appearing; (2) the forum
> state's interest in adjudicating the dispute; (3) the
> plaintiff's interest in obtaining convenient and
> effective relief; (4) the judicial system's interest
> in obtaining the most effective resolution of the
> controversy; and (5) the common interests of all
> sovereigns in promoting substantive social policies.

33

Sawtelle, 70 F.3d at 1394.  This inquiry "is influenced by the strength of the plaintiff's showing of relatedness and purposeful availment . . . .  The gestalt factors rarely preclude jurisdiction where the first two prongs have been established, but will often tip against exercising jurisdiction when the other factors are weak."  GT Solar, 2009 WL 3417587, at *9 (internal citations omitted).  The appeals court has described a sliding scale wherein the weaker the plaintiff's demonstration of minimum contacts, the less a defendant need show to establish that the exercise of jurisdiction over him is unreasonable.  See Ticketmaster-New York, Inc. v. Alioto, 26 F.3d 201, 210 (1st Cir. 1994).  Further, "[e]ven if the defendant's actions create sufficient minimum contacts, the court must still consider whether the exercise of personal jurisdiction over the defendant would offend traditional notions of fair play and substantial justice."  Toytrackerz, 2009 WL 1505705, at *5 (internal quotations and citations omitted).

      a.   Strength of First Two Negron-Torres Factors

As explained above, plaintiff showed a relationship between the forum state and defendant's use on the internet of a domain name and email extension similar to plaintiff's marks.  These contacts are only "related" to the claims before the Court for

purposes of satisfying the <u>Negron-Torres</u> test, in one respect: plaintiff's claim that the defendant's internet presence infringed plaintiff's trademarks as to any internet users in New Hampshire.

Moving to "purposeful availment," the only action on the part of defendant that constituted "purposeful availment" was the use of "pc-connections.com" in Crabtree's email signature, and the use of the "@pc-connections.com" email extension in communicating with an existing client after the August 20, 2010, issuance of the TRO.  Such use was minimal, at best, and there is no indication that any actual confusion of marks, or financial gain at plaintiff's expense, resulted from that use.

For purposes of evaluating the "reasonableness" prong, therefore, I begin with the premise that the plaintiff's showing on the first two prongs is not overwhelming, given that the defendant's internet presence was not directed toward New Hampshire users in any particular manner, and was in fact specifically directed at users near Hedgesville, West Virginia. With that in mind, I will evaluate the gestalt factors to determine whether or not exercising personal jurisdiction is reasonable and fair, and thus satisfies due process.

b.   Gestalt Factors

i.   Burden on Defendant

Defendant is a single father and sole proprietor of a small computer business proceeding pro se.  Although answering this matter in this forum would present some practical burden to defendant, I cannot find that his circumstances are unique or extraordinary.  This factor, therefore, is neutral.

ii.   Forum State's Interest

New Hampshire certainly has an interest in resolving business disputes that concern New Hampshire corporations.  The Northern District of West Virginia, however, maintains a similar interest in litigating matters concerning businesses located there.  This factor is therefore neutral and does not favor either side.

iii. Plaintiff's Interest in Convenient and Effective Relief

Plaintiff has an interest in convenient relief in this Court, as the company and presumably many of its witnesses live in this jurisdiction.  Plaintiff's interest in litigating this matter locally, however, is tempered by the fact that PC Connection conducts business nationwide.  Accordingly, while the facts relevant to this factor tend to favor exercising

jurisdiction, I do not accord this factor a great deal of weight in my consideration.

### iv.   Judicial System's Interest

I find that the judicial system's interest in obtaining the most effective resolution of this matter favors neither the exercise nor refusal to exercise personal jurisdiction in this matter.  See GT Solar, 2009 WL 3417587, at *11 (finding that in most cases, the judicial system's interest in a matter will not favor either side of a personal jurisdiction dispute).  In either forum in question here, West Virginia or New Hampshire, the judicial system is interested in promoting efficient and convenient resolution of the issues presented by this case. Further, litigation in either forum is likely to present convenience and other issues for the court to resolve.

### v.   Public Policy Considerations

Several issues of substantive public policy are presented in this matter.  To exercise personal jurisdiction over defendant here, the Court would be finding that simply by discovering a legally obtained but potentially infringing mark in use somewhere, sending a "cease and desist" letter, and then initiating negotiations to resolve the matter, plaintiff, or a like-situated company, could hale almost any defendant with a web presence into court in its home forum.  Here, there is no

37

allegation, and no evidence, that defendant intentionally
obtained a domain name similar to plaintiff's marks in an effort
to sell the domain name back to plaintiff for profit or to
somehow hold the domain name for ransom.  There is no evidence
that even a single person was confused by defendant's use of the
domain name.  There is no evidence that defendant ever intended
to do any business in New Hampshire or anywhere outside of a
twenty-five mile radius of Hedgesville, West Virginia.  The
record before this Court reveals a small businessman trying to
start a business by legally purchasing a domain name suggested
by GoDaddy.com, with neither any knowledge of PC Connection nor
intent to injure PC Connection in any way.

     The plaintiffs have demonstrated only very minimal contacts
made with New Hampshire by defendant, and of that contact, only
a small amount of post-TRO use of the potentially infringing
marks can constitute "purposeful availment" of the benefits of
doing business in this forum.  With the exception of minimal
continued use of the domain name for approximately one week
post-TRO, and limited use of the email extension for
approximately one month post-TRO, there is no evidence of any
intent to infringe on PC Connection's marks, no intent to cause
confusion or to benefit from PC Connection's good will, and no
intent to extort money from PC Connection.  On this record, with

such a minimal showing of relevant contacts, and strong public

policy favoring a refusal to exercise jurisdiction in this

matter, I find that exercising personal jurisdiction over

defendant, on this record, "would offend traditional notions of

fair play and substantial justice," Toytrackerz, 2009 WL

1505705, at *5, and I decline to do so.

III. Transfer

Under 28 U.S.C. § 1631,[3] a civil action that is filed in a

court without jurisdiction to consider the matter may be

transferred to a court where the action could have properly been

brought at the time it was filed.  See Cimon v. Gaffney, 401

F.3d 1, 7 n.21 (1st Cir. 2005) (supporting the view that § 1631

authorizes transfers to allay any jurisdictional defect,

including a personal jurisdiction defect, after collecting

---

[3]28 U.S.C. § 1631 provides:

> Whenever a civil action is filed in a court as defined
> in section 610 of this title or an appeal, including a
> petition for review of administrative action, is
> noticed for or filed with such a court and that court
> finds that there is a want of jurisdiction, the court
> shall, if it is in the interest of justice, transfer
> such action or appeal to any other such court in which
> the action or appeal could have been brought at the
> time it was filed or noticed and the action or appeal
> shall proceed as if it had been filed in or noticed
> for the court to which it is transferred on the date
> upon which it was actually filed in or noticed for the
> court from which it is transferred.

conflicting authorities on the question of whether § 1631 authorizes transfers to cure a want of personal jurisdiction). I find that this matter could properly have been filed in the United States District Court for the Northern District of West Virginia, which possesses personal jurisdiction over the defendant, at the time it was filed here.  Further, plaintiff concedes that it does business in West Virginia, so it appears the Northern District of West Virginia likely has personal jurisdiction over PC Connection.

## CONCLUSION

Plaintiff has failed to satisfy the Negron-Torres test for personal jurisdiction.  Accordingly, I decline to exercise personal jurisdiction over defendant.  The motion for preliminary injunction is denied.  I direct that this case be transferred to the United States District Court for the Northern District of West Virginia for consideration.

**SO ORDERED.**

_____
Landya B. McCafferty
United States Magistrate Judge


Date:  December 6, 2010

cc:  Steven E. Grill, Esq.
     Anne E. Trevethick, Esq.
     Dayton Crabtree, pro se